# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Newnan

APR 17 2013

James N. Hatten, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

**3 13-CV-067**

|  |  |
|---|---|
| UNITED STATES ex rel. SHARON KOPKO, ) | Civil Action No. _____ |
| ) | |
| Plaintiff-Relator, ) | |
| ) | **FILED IN CAMERA AND** |
| v. ) | **UNDER SEAL** |
| ) | |
| GEORGIA BONE & JOINT, L.L.C., ) | |
| SOUTHERN BONE & JOINT, LLC, ) | |
| CHAD M. KESSLER, M.D., ) | Jury Trial Requested |
| GEORGE M. BALLANTYNE, M.D., ) | |
| MICHAEL V. CUSHING, M.D., ) | |
| JASON A. MCMATH, M.D., ) | |
| JACK H. POWELL, III, M.D., ) | |
| MICHAEL GRUBER, M.D., ) | |
| SENTRY ANESTHESIA ) | |
| MANAGEMENT, LLC, and ) | |
| DAVID L. LAGUARDIA, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Sharon Kopko

("Relator"), for herself and on behalf of the United States, to recover

damages and civil penalties arising from Defendants' actions in violating the

False Claims Act, 31 U.S.C. § 3729 *et seq.*

Jurisdiction and Venue

2.

This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a). Defendants can be found, reside, or transact business within the district, and many of the acts forming the basis of this action occurred within the district.

The Parties and Related Entities

5.

Defendant Georgia Bone & Joint, L.L.C. ("GBJ") is a Georgia limited liability company created in 2001. GBJ operates two orthopedic clinics in Newnan, Georgia and Peachtree City, Georgia. The Newnan clinic is located on the second floor of the Summit Healthplex at 1755 Highway 34 E Suite 1100, Newnan, Georgia 30265.

6.

Defendant Southern Bone & Joint, LLC ("SBJ") is a Georgia limited liability company created in 1997.  SBJ operates an orthopedic ambulatory surgery center, known as Summit Orthopedic Surgery Center (the "Surgery Center"), located on the first floor of the Summit Healthplex at 1755 Highway 34 E Suite 1100, Newnan, Georgia 30265.

7.

Defendants Chad M. Kessler, M.D., George M. Ballantyne, M.D., Michael V. Cushing, M.D., Jason A. McMath, M.D., Jack H. Powell, III, M.D., and Michael Gruber, M.D. (the "Physician Defendants") are physicians who practice orthopedics at GBJ and SBJ, and are owners of GBJ and SBJ.  The patients who undergo procedures at the Surgery Center are patients of the Physician Defendants and of GBJ.  Collectively, the Physician Defendants, SBJ, and GBJ are referred to herein as the "GBJ Defendants."

8.

Defendant Sentry Anesthesia Management, LLC ("Sentry") is a Georgia limited liability company formed in 2005.  The GBJ Defendants

3

have contracted with Sentry to provide anesthesia services at the Surgery Center.

9.

Defendant David L. LaGuardia ("LaGuardia") is a certified registered nurse anesthetist ("CRNA"), and, upon information and belief, is a part owner of Sentry. LaGuardia is also the Chief Executive Officer of GBJ and SBJ. Sentry and LaGuardia are referred to herein as the "Sentry Defendants."

10.

Relator is resident of the state of Georgia and is a former employee of the GBJ Defendants. She worked as a part-time PRN nurse at the surgery center from October 2008 until approximately February 2009, when she started working full-time. Around October 2009, she became nurse manager at the Surgery Center. From March 31, 2010 until February 2012, she was the administrator of the Surgery Center and GBJ.

<u>Ambulatory Surgery Center Billing</u>

11.

42 C.F.R. § 416.2 defines "ambulatory surgical center" as follows:

Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services

4

to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission. The entity must have an agreement with CMS [the Centers for Medicare and Medicaid Services] to participate in Medicare as an ASC, and must meet the conditions set forth in subparts B and C of this part.

12.

Subpart C of 42 C.F.R. Part 416 (42 C.F.R. §§ 416.40-416.52) contains a number of conditions of coverage for ASCs. An ASC must meet these conditions in order to participate in the Medicare program. 42 C.F.R. § 416.1(b)(1). As part of its agreement with CMS, an ASC must agree, among other things, to meet these conditions for coverage and to promptly report to CMS any failure to do so. 42 C.F.R. 416.30.

13.

One of the conditions of coverage is set forth in 42 C.F.R. § 416.42, providing as follows:

§ 416.42 Condition for coverage -- Surgical services.

Surgical procedures must be performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the ASC in accordance with approved policies and procedures of the ASC.

(a) Standard: Anesthetic risk and evaluation. (1) A physician must examine the patient immediately before surgery to evaluate the risk of anesthesia and of the procedure to be performed.

(2) Before discharge from the ASC, each patient must be evaluated by a physician or by an anesthetist as defined at § 410.69(b) of this chapter, in accordance with applicable State health and safety laws, standards of practice, and ASC policy, for proper anesthesia recovery.

(b) Standard: Administration of anesthesia. Anesthetics must be administered by only --

(1) A qualified anesthesiologist; or

(2) A physician qualified to administer anesthesia, a certified registered nurse anesthetist (CRNA) or an anesthesiologist's assistant as defined in § 410.69(b) of this chapter, or a supervised trainee in an approved educational program. In those cases in which a non-physician administers the anesthesia, unless exempted in accordance with paragraph (d) of this section, the anesthetist must be under the supervision of the operating physician, and in the case of an anesthesiologist's assistant, under the supervision of an anesthesiologist.

(c) Standard: State exemption. (1) An ASC may be exempted from the requirement for physician supervision of CRNAs as described in paragraph (b)(2) of this section, if the State in which the ASC is located submits a letter to CMS signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs. The letter from the Governor must attest that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law.

(2) The request for exemption and recognition of State laws, and the withdrawal of the request may be submitted at any time, and are effective upon submission.

14.

Another condition of coverage is set forth in 42 C.F.R. § 416.47,

providing as follows:

§ 416.47 Condition for coverage – Medical records.

The ASC must maintain complete, comprehensive, and accurate medical records to ensure adequate patient care.

(a) Standard: Organization. The ASC must develop and maintain a system for the proper collection, storage, and use of patient records.

(b) Standard: Form and content of record. The ASC must maintain a medical record for each patient. Every record must be accurate, legible, and promptly completed. Medical records must include at least the following:

(1) Patient identification.
(2) Significant medical history and results of physical examination.
(3) Pre-operative diagnostic studies (entered before surgery), if performed.
(4) Findings and techniques of the operation, including a pathologist's report on all tissues removed during surgery, except those exempted by the governing body.
(5) Any allergies and abnormal drug reactions.
(6) Entries related to anesthesia administration.
(7) Documentation of properly executed informed patient consent.
(8) Discharge diagnosis.

15.

The Surgery Center is a Medicare-certified ASC, and has an

agreement with CMS as described above.

7

16.

Medicare compensates ASCs for their facility fees pursuant to a

prospective payment system. Each of the more than 3,000 approved ASC

surgical procedures is classified into an ambulatory payment classification

("APC") group, and all services within an APC have the same payment rate.

The APC payment does not include payment for physicians' or anesthetists'

professional services, which are billed separately. 42 C.F.R. § 416.164(c).

However, the APC payment does include payment for "[s]upervision of the

services of an anesthetist by the operating surgeon." 42 C.F.R. §

416.164(a)(14).

17.

Because none of the GBJ physicians is an anesthesiologist, the GBJ

Defendants have contracted with Sentry to provide anesthesia services at the

Surgery Center. All such anesthesia services are provided by Sentry

CRNAs, including LaGuardia. There is routinely no anesthesiologist present

at the Surgery Center.

18.

When procedures are performed at the Surgery Center, SBJ submits a

claim to Medicare for the facility component of such services under the ASC

prospective payment system, and a separate claim for the professional

services of its physician. Sentry submits a claim for the anesthesia services

provided by its CRNAs. A large percentage of such claims are submitted to

Medicare or other federal healthcare programs.

## Improper Billing for ESIs

### 19.

One of the most common surgical procedures performed in the

Surgery Center is an Epidural Steroid Injection (ESI), which involves

inserting a needle into the epidural space in the patient's spine. C-arm is

used so that structures will be visible on an x-ray, confirming that the needle

is in the proper location. At that point, a steroid solution is injected through

the needle into the epidural space. Frequently, the patient will be given a

short-acting intravenous anesthetic, such as Fentanyl or Versed, in order to

sedate the patient prior to the procedure.

### 20.

As a matter of routine, LaGuardia, who is not a physician, performs

nearly all of the steps in the process of administering an ESI, without any

involvement of a physician. The patient will not be seen by a physician

when he arrives at the Surgery Center, but will be taken straight to the

procedure room. LaGuardia, or another staff member who is not a physician, will administer the Fentanyl or Versed anesthesia medicines. LaGuardia then localizes the treatment area, takes x-rays, and inserts the needle into the epidural space. Only then does LaGuardia summon the physician, whose sole involvement in the procedure is to press the syringe inserting the medication into the epidural space.

21.

In general, the above practice applies for all of Dr. Ballantyne's and Dr. Cushing's patients, almost all of Dr. Kessler's patients, and some of Dr. Powell's patients. Dr. Kessler and Dr. Powell are the only two GBJ/SBJ physicians who are trained in performing ESIs.

22.

Following the ESI procedure, the patient is transferred to a recovery room, known as a "post-anesthesia care unit," or "PACU." Routinely, the patient is then discharged by a PACU nurse without receiving a post-procedure evaluation by a physician or anesthetist.

23.

This process violates the ASC conditions of coverage in several ways. First, the patient is not evaluated by a physician immediately prior to the

10

procedure, as required by 42 C.F.R. § 416.42(a)(1). Second, the patient is not evaluated by a physician or anesthetist prior to discharge, as required by 42 C.F.R. § 416.42(a)(2). Third, because LaGuardia personally performs major portions of the procedure without the presence of the physician, the service is not "performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the ASC in accordance with approved policies and procedures of the ASC," as required by 42 C.F.R. § 416.42. Fourth, LaGuardia and the other nurses are not acting under the supervision of the operating physician when administering anesthesia, as required by 42 C.F.R. § 416.42(b)(2). Generally, the operating physician is not present in the Surgery Center or immediately available to conduct hands-on intervention if needed, but is in his GBJ office, which is not part of the Surgery Center. Indeed, in many cases the physician is not even in the facility at the time the procedure begins. There have been times when a patient has had to wait 15-45 minutes for a physician to arrive from the hospital or Peachtree City office, while the patient lies on the table with the needle already inserted, waiting for the steroid to be injected.

24.

In addition to submitting claims for the facility fees under the APC

system, SBJ submits claims for the physician's professional services in

performing the ESI procedures.  These claims are submitted in CMS-1500

format, and include a certification that

> I certify that the services shown on this form were medically
> indicated and necessary for the health of the patient and were
> personally furnished by me or were furnished incident to my
> professional service by my employee under my immediate
> personal supervision, except as otherwise expressly permitted by
> Medicare or CHAMPUS regulations.
>
> For services to be considered as "incident" to a physician's
> professional service, 1) they must be rendered under the
> physician's immediate personal supervision by his/her employee,
> 2) they must be an integral, although incidental part of a covered
> physician's service, 3) they must be of kinds commonly furnished
> in physician's offices, and 4) the services of nonphysicians must
> be included on the physician's bills.

25.

These claims are false because, as discussed above, the most

significant and demanding portions of the procedures are not performed by

the physician, but by LaGuardia.  Thus, the procedures are not personally

performed by the physician or under his immediate personal supervision,

and the parts of the procedure performed by LaGuardia are not merely an

incidental part of the physician's service, but are instead the critical parts of the service.

## Improper Billing for Anesthesia

### 26.

As discussed above, the APC payment does not include payment for physicians' or anesthetists' professional services, which are billed separately. Sentry routinely submits claims for services performed by LaGuardia or other CRNAs for anesthesia services provided to Surgery Center patients.

### 27.

With respect to the administration of anesthesia in an ASC, 42 C.F.R. § 416.42 provides as follows:

(b) Standard: Administration of anesthesia. Anesthetics must be administered by only --

(1) A qualified anesthesiologist; or

(2) A physician qualified to administer anesthesia, a certified registered nurse anesthetist (CRNA) or an anesthesiologist's assistant as defined in § 410.69(b) of this chapter, or a supervised trainee in an approved educational program. In those cases in which a non-physician administers the anesthesia, unless exempted in accordance with paragraph (d) of this section, the anesthetist must be under the supervision of the operating physician, and in the case of an anesthesiologist's assistant, under the supervision of an anesthesiologist.

(c) Standard: State exemption. (1) An ASC may be exempted from the requirement for physician supervision of CRNAs as described in paragraph (b)(2) of this section, if the State in which the ASC is located submits a letter to CMS signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs. The letter from the Governor must attest that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law.

28.

Georgia has not exempted ASCs from the requirement of physician supervision of CRNAs. Nevertheless, anesthesia is routinely provided at the Surgery Center by LaGuardia and other CRNAs without the supervision of the operating physician.

29.

Moreover, LaGuardia routinely falsifies anesthesia records to increase billings for anesthesia services. Payment for anesthesia services is largely driven by the number of minutes of anesthesia time provided. As set forth in the Medicare Anesthesia Billing Guide,

14

Anesthesia time is defined as the period during which an anesthesia practitioner is present with the patient. It starts when the anesthesia practitioner begins to prepare the patient for anesthesia services in the operating room or an equivalent area and ends when the anesthesia practitioner is no longer furnishing anesthesia services to the patient, that is, when the patient may be placed safely under postoperative care.

30.

As a matter of routine, LaGuardia does not complete patient charts until after the procedure has been completed, frequently at the end of the day. When he does complete the patient charts, he routinely fabricates anesthesia start and stop times based on the times the patient arrived at and departed the facility, rather than the times the anesthesia services began and ended, in order to increase the number of anesthesia units that may be billed. In addition, he will frequently falsify the identity of the anesthetist providing the services, and will invent other important entries for patients' vital signs, such as blood pressure readings, which are not generally monitored during the performance of the procedure.

31.

Relator has personally reviewed patient charts in response to patient complaints about anesthesia bills, and seen that LaGuardia was overbilling by overstating the anesthesia time. Renee Morris, the billing manager for

15

Sentry, GBJ, and the Surgery Center, has told Relator on several occasions

that Sentry's billing employees have expressed concern for their jobs and

certifications due to overbilling anesthesia time.  Morris told Relator that

such billers have frequently changed the amount of anesthesia time billed

because they knew the time stated by LaGuardia was too high.  Morris has

told Relator that she would be worried if they were audited.

32.

On one occasion, a member of the billing department asked Relator to

have an anesthesia record corrected because it identified as the anesthesia

provider a CRNA who had been on vacation at the time, and because it

appeared that the anesthesia times had been altered.  When Relator took the

record to LaGuardia, he became very angry, and wrote a message on the

record stating never to ask him such questions again.  When Relator returned

the record to Morris, Morris told her that she was keeping the record, and

that if they ever treated her badly again she would report them to the OIG

and become a millionaire.

Failure to Maintain Accurate Medical Records

33.

As discussed above, one of the conditions of coverage requires an
ASC to maintain "complete, comprehensive, and accurate medical records."
The records "must be accurate, legible, and promptly completed," including
"[e]ntries related to anesthesia administration." 42 C.F.R. § 416.47. At all
times relevant to this complaint, the Surgery Center has failed to meet this
requirement. To the contrary, the Surgery Center has had policies and
practices that ensured that medical records were not accurate or promptly
completed.

34.

When Relator began working at the Surgery Center in October 2008
as a PRN nurse, she noticed that the nurse manager, Cathy Powell, was
having full-time nurses perform chart audits and flag places in the medical
records that were incomplete or were missing a physicians' signature. The
nurses would routinely sign the physicians' names, including on
prescriptions, and would practice how to make the physician's signatures.
When Relator became a full-time nurse in early 2009, she told Powell that
she would not forge physicians' signatures. Powell told her that was fine,

17

and that she should just bring the documents to Powell or Carol Jordan for them to sign. When Relator became nurse manager in or around October 2009, she told the Surgery Center board that nurses would no longer be signing physicians' names for anything.

35.

In addition, as discussed above, the Surgery Center routinely fails to keep accurate and prompt records relating to the administration of anesthesia. The Surgery Center does not have a policy or practice of completing anesthesia records promptly, as LaGuardia routinely does not complete them until well after the procedure is completed. Nor does the Surgery Center have a policy or practice of ensuring that such records are accurate. As discussed above, LaGuardia routinely falsifies critical information, such as anesthesia start and end times. Moreover, he routinely fails to keep track of the patient's vital signs while anesthesia is being administered, and simply fabricates entries when filling out the records at a later time.

Anti-Kickback Statute

36.

The Anti-Kickback Statute ("AKS") makes it illegal to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for (i) referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. 1320a-7b(b)(1).

37.

The AKS also makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to

purchase, lease, order, or arrange for or recommend purchasing, leasing, or

ordering any good, facility, service, or item for which payment may be made

in whole or in part under a Federal health care program.  42 U.S.C. 1320a-

7b(b)(2).

### 38.

Compliance with the AKS is a condition of payment under Medicare,

Medicaid, and other federal healthcare programs, and claims for payment

pursuant to referrals that violate the AKS constitute false claims.  In

submitting a claim for payment to a federal healthcare program, a person

implicitly certifies that the services were provided in compliance with the

AKS.

### 39.

Sentry provides remuneration to the GBJ Defendants to induce them

to refer Surgery Center patients to Sentry for anesthesia services.  Among

other things, Sentry pays substantial annual bonuses to Surgery Center

employees, generally amounting to approximately $2,000 for a nurse and

lesser amounts for other employees.  These bonuses total approximately

$40,000 per year, and constitute a substantial benefit to the GBJ Defendants.

40.

These bonuses were paid out of what was referred to as a "block fund." LaGuardia (who is also the CEO of GBJ and SBJ) persuaded the GBJ Defendants to allow Sentry to perform nerve blocks (typically, an injection of lidocaine, marcaine or some similar medication) on nearly all patients undergoing procedures at the Surgery Center, regardless of whether such block was medically necessary for a particular patient.  For example, if a patient came to the Surgery Center for a wrist surgery or a shoulder arthroscopy, LaGuardia or another Sentry CRNA would tell the patient that a nerve block would assist in post-operative recovery, and would provide the injection.  Sentry was able to bill for anesthesia services for such patients, and used the funds generated from such blocks to pay the bonuses.

41.

This arrangement resulted in substantial overutilization of nerve blocks, a large percentage of which were billed to Medicare or other federal healthcare programs.  Moreover, this practice resulted in the submission of a large number of false claims for services that were not medically necessary or properly ordered by a physician.

42.

In addition, SBJ has paid kickbacks to at least one of the GBJ
physicians to induce him to perform procedures in the Surgery Center rather
than in the GBJ office. Dr. Kessler previously performed ESIs on his
patients in his GBJ office, which is located one floor above the Surgery
Center. In or around 2011, SBJ began paying Dr. Kessler a "site of service
fee" for every patient he referred to the Surgery Center for ESIs. This
payment was intended to compensate Dr. Kessler for the reduced
professional fee he would personally receive by performing the service in
the Surgery Center rather than his office. The payment was thus intended to
induce Dr. Kessler to refer the patient to the Surgery Center, which could
then bill for the facility fee.

43.

The legality of this arrangement was discussed at a February 1, 2012
GBJ board meeting attended by Relator. During that meeting, Dr. Kessler
said that if they stopped paying him the site of service fee, he would stop
doing ESIs in the Surgery Center. LaGuardia stated his belief that this
arrangement was only illegal if Dr. Kessler was paid by SBJ directly. He

recommended that they "shuffle money" from SBJ to GBJ, and have GBJ

pay Dr. Kessler the site of service fee.

44.

All claims for payment submitted to Medicare or other federal

healthcare programs for services provided pursuant to a referral in violation

of the Anti-Kickback Statute constitute false claims.

Requirement to Return Overpayments

45.

As discussed above, Defendants have presented or caused to be

presented numerous false claims to Medicare and other federal healthcare

programs. 42 U.S.C. § 1320a-7k(d) requires a health care provider to report

and return any overpayments it has received from the Medicare or Medicaid

program by the later of (i) 60 days after the overpayment is identified, or (ii)

the date any corresponding cost report is due. The term "overpayment"

means any funds that a person receives or retains under the Medicare or

Medicaid program to which the person, after applicable reconciliation, is not

entitled. Thus, Defendants have had, and continue to have, an affirmative

obligation to report and return all payments for the false claims described

above, and have failed to report or return such payments.

## COUNT I
## FEDERAL FALSE CLAIMS ACT

46.

The allegations in the preceding paragraphs are incorporated by reference.

47.

Defendants violated the Federal False Claims Act in that they:

(1)     have knowingly presented or caused to be presented numerous false claims for payment or approval, and continue to do so;

(2)     have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved, and continue to do so;

(3)     have knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government;

(4)     have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, and continue to do so; and

24

(5)　have conspired to commit the above acts, and to defraud the government by getting false or fraudulent claims allowed or paid, and continue to do so.

48.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## RETALIATION

49.

The allegations of the preceding paragraph are incorporated by reference.

50.

Defendants retaliated against Relator because of lawful acts by Relator to stop one or more violations of the False Claim Act and lawful acts by Relator in furtherance of an action under 31 U.S.C. § 3730. This retaliation included, but was not limited to, termination of Relator's employment.

51.

As a result of Defendants' actions, Relator has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of herself and the United States, prays:

(a)    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the False Claims Act;

(b)    That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(c)    That Relator receive all relief necessary to make Relator whole for Defendants' violation of 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back-pay, interest on the back-pay, and compensation for special damages;

(d)    That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e)    That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

Michael A. Sullivan
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree St., Suite 1700
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com
Attorneys for Plaintiff-Relator